# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **HOROB LIVESTOCK INC**, | Case No. **06-60149-7** |
| Debtor, | |
| and | |
| In re | |
| **TODD K. HOROB**, | Case No. **06-60150-7** |
| Debtor. | |
| **JOSEPH V. WOMACK**, | |
| Plaintiff. | |
| -vs- | Adv No. **07-00001** |
| **HOROB LIVESTOCK INC**, **JAMES L. HOROB**, **BEA M. HOROB**, **LARRY G. HOROB**, **TODD KENNETH HOROB**, **TERESA HOROB**, **WELLS FARGO BANK, NATIONAL ASSOCIATION**, **DARYLE SYME**, **MARY ZIEGLER**, and **JAMES ZIEGLER**, | (Lead Adversary Proceeding) consolidated with Adv. No. 06-00150 |
| Defendants. | |

## *MEMORANDUM of DECISION*

At Butte in said District this 17th day of December, 2007.

The Court consolidated the above-referenced Lead Adversary Proceeding 07-00001 and

Adversary Proceeding 06-00150 by Order entered June 27, 2007.  Defendants Todd and Teresa

1

Horob failed to file a timely answer in this Proceeding and upon request of the Plaintiff, the Clerk entered default against Todd and Teresa Horob on February 20, 2007, but said entry of default was subsequently set aside on February 26, 2007. Todd and Teresa Horob filed an answer contemporaneously with the stipulation to set aside default, but they have not taken any action, other than filing an answer, to defend in this Adversary Proceeding.[1] Todd Horob agreed to waive his Chapter 7 discharge in a Stipulation for Waiver of Discharge dated November 16, 2006. The Stipulation for Waiver of Discharge was approved by Order entered November 21, 2006.

Through various stipulations that were filed and approved, all claims against Lyle Hove, Daryle Syme, James and Mary Ziegler, d/b/a Lake Region Livestock, Hank's Wheat Ranch, Jeanne Hoglund and Martha Heller have been resolved. In addition, by stipulation filed October 10, 2007, Farm Credit Services of North Dakota, ACA, and its subsidiaries, Farm Credit Services of North Dakota, FLCA, and Farm Credit Services of North Dakota, PCA (collectively referred to as "FCS") were dismissed from this proceeding. Likewise, the Plaintiff has either dismissed or resolved all claims for punitive and money damages and Wells Fargo Bank, N.A. ("Wells Fargo") has voluntarily dismissed all its cross-claims for punitive damages along with its civil conspiracy claims. As a result of the foregoing, the Court entered a Memorandum of Decision on

---

[1] Todd Horob has never personally appeared before this Court in either this consolidated Adversary Proceeding or Todd's main bankruptcy case. The Plaintiff and Wells Fargo listed Todd as a trial witness and further stated that Todd's testimony would be presented through a deposition. The Court was presented with a copy of Todd's telephone deposition taken September 4, 2007. However, after itemizing the various medications he was taking at that time, Todd exercised his Fifth Amendment right in response to all other questions. The Trustee also intended to submit, as evidence, the transcript of Todd's 2004 examination taken in 2006, but withdrew such request at the conclusion of the trial.

2

October 4, 2007, denying James and Bea's request for a jury trial finding that the remaining claims in the consolidated Adversary Proceedings were equitable, rather than legal, in nature.

On October 9, 2007, prior to the dismissal of FCS from this proceeding and prior to settlement of the Plaintiff's claims against Martha Heller and Jeanne Hoglund, the Plaintiff, Wells Fargo, Larry Horob ("Larry"), FCS, Martha Heller, Jeanne Hoglund, James L. Horob ("James") and Bea M. Horob ("Bea") filed a Final Pretrial Order. The Court approved the Final Pretrial Order on October 10, 2007, and in such Order noted that the Final Pretrial Order would supersede all previously filed pleadings and would govern the course of trial unless it appeared that modification of the Final Pretrial Order was necessary to prevent manifest injustice.

After due notice, trial in the consolidated Adversary Proceedings was held October 15, 16 and 17, 2007, in Billings, Montana. At the trial, the Plaintiff, Joseph V. Womack of Billings, Montana ("Trustee") appeared as attorney for the bankruptcy estate. In addition, Wells Fargo was represented by attorneys William Lamdin and Kevin P. Heaney of Billings, Montana; and James and Bea were represented by attorney Kevin J. Chapman of Williston, North Dakota. Larry was not represented at the trial but maintains that his defenses to Wells Fargo's cross-claims are aligned with the defenses of James and Bea in this Proceeding. The Final Pretrial Order filed by the parties specifically provides in paragraph 1D that "[a]s his defenses, Larry Horob herein adopts and incorporates, by reference herein, any and all defenses as asserted by James and Bea Horob in this matter." Thus, Larry's attorney, H. Malcolm Pippin of Williston, North Dakota, did not appear at the trial, and attorney Chapman conducted the direct examination of Larry.

At the commencement of the trial, the parties stipulated that James and Bea's Exhibits A

through LL and the Trustee and Wells Fargo's Exhibits 1, 3 through 70, 72 through 77, 80 through 118, 125, 130 through 138, 150 through 153, 156 and 157 could be admitted into evidence without objection. The parties similarly stipulated that Exhibit 2 could be admitted into evidence in accordance with the terms and conditions of an Amended Stipulation filed October 11, 2007, and approved October 12, 2007. During the trial, the parties agreed that Exhibits 118a, 118b and 118c could be admitted into evidence and the Court allowed the admission of Exhibits 71, 78, 79, 119, 141 and 155 into evidence over the objection of James and Bea. At the conclusion of the trial, the Trustee and Wells Fargo withdrew Exhibits 120 through 124, 126 through 129, 139, 140 142 through 145 and 155. The parties also agreed that the Court could consider the deposition testimony of Jerry Grev, Richard Nichols, Duane Smith, Todd Horob, Craig McIvor and Russ Nehring in lieu of live testimony of such witnesses. The Court heard live testimony from witnesses Jerald Lundgren, Malcolm Goodrich, Roger Cymbaluk, Jim Winchell, Russ Rogne, James, Larry, Laurie Garbel, Lois Jeanne Hoglund and Tami L. Nelson. At the conclusion of the trial, the Court granted the parties through November 2, 2007, to file simultaneous post-trial briefs. The Trustee, Wells Fargo and James have filed their post-trial briefs and the matter is ready for decision. This Memorandum of Decision sets forth the Court's findings of fact and conclusions of law and for the reasons discussed herein, the Court finds in favor of the Trustee and Wells Fargo.

## JURISDICTION

The Court has jurisdiction over these consolidated Adversary Proceedings pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (F), (H), (K) and (O), and particularly § 157(b)(2)(F), dealing with "proceedings to determine, avoid, or

4

recover preferences". The parties stipulate and agree in the Final Pretrial Order that "[b]oth bankruptcies were filed voluntarily in the United States Bankruptcy Court for the District of Montana and personal jurisdiction and venue are not questioned."

## BACKGROUND

The Trustee summarizes the pertinent facts in this Proceeding as follows:

1. Todd K. Horob is an individual residing in Williston, North Dakota, doing business in Montana and North Dakota. He voluntarily filed his bankruptcy petition in the United States Bankruptcy Court for the District of Montana on March 24, 2006, and an Order for Relief was entered by the Court on that date.

2. James L. Horob is an individual residing in Williams County, North Dakota, near Williston, North Dakota. He is the brother of Todd K. Horob.

3. Larry G. Horob is an individual residing in Williston, North Dakota. He is the father of Todd K. Horob and James L. Horob.

4. Horob Livestock Inc. is a North Dakota Corporation authorized to do business in North Dakota and Montana. Horob Livestock, Inc. voluntarily filed its bankruptcy in the United States Bankruptcy Court for the District of Montana on March 24, 2006, and an Order for Relief was entered by the Court on that date.

5. Todd K. Horob and James L. Horob are each 50% owners of the shares of stock of Horob Livestock Inc. and each is one of the two directors of the corporation. Todd is the President and Secretary/Treasurer of Horob Livestock, Inc. and James is listed as the Vice President of Horob Livestock, Inc.

6. Farm Credit Services of North Dakota ACA and its subsidiaries, Farm Credit

5

Services of North Dakota, FLCA and Farm Credit Services of North Dakota, PCA, herein collectively referred to as "Farm Credit Services" is a federally chartered corporation whose address is 3100 10th Street SW, Minot, North Dakota 58701.

7. Wells Fargo Bank, National Association, herein "Wells Fargo," is a national banking association with an office located in Minot, North Dakota.

8. The records of the Office of the County Recorder of Williams County, North Dakota show that a portion, but not all, of the property involved in this case was and is subject to mortgages held by Farm Credit Services of North Dakota. The portion of the property that is subject to mortgages held by Farm Credit Services of North Dakota is described as follows:

> Township 155 North, Range 104 West, 5th P.M.
> Section 1: NW¼
> Section 10: Lots 1(33.24), 2(33.16), E½NE¼ a/k/a NE¼
> Section 11: NE¼
> Section 13: NW¼
>
> Township 156 North, Range 104 West, 5th P.M.
> Section 10: Lots 3(36.99), 4(36.73), E½SE¼ a/k/a SE¼
> Section 13: NW¼
> Section 14: NE¼
> Section 15: Lots 1(36.49), 2(36.27), E½NE¼ a/k/a NE¼
> Section 22: Lots 1(35.59), 2(35.31), E½NE¼ a/k/a NE¼

The above described property is referred to as the "Farm Credit Mortgage Property".

9. The Farm Credit Mortgage Property secures a debt in the approximate amount of $450,000.00 owed to Farm Credit Services. Farm Credit Services' mortgages are superior to any claimed interest of the Trustee and Wells Fargo with respect to the Farm Credit Service Mortgage Property.

10. Wells Fargo has no claim or interest in the alleged property of either Todd Horob

6

or Horob Livestock, Inc. that the Trustee seeks to recover.

11. The claim of the Trustee as to the alleged interests of Todd Horob and Horob Livestock, Inc. in any of the property that the Trustee seeks to recover is superior to any interest of Wells Fargo in said property.

12. The Trustee has no claim against the alleged 1/3 undivided interest of Larry Horob in the property that Wells Fargo seeks to set aside.

The Court would expand upon the Trustee's list of undisputed facts to further explain the history in this case. Larry and Lois Jeanne Hoglund ("Jeanne") were previously married, but divorced in 1986 or thereabouts, and are the parents of James, Laurie Garbel, Tami L. Nelson, Todd K. Horob ("Todd") and one other unnamed child. Larry and Jeanne raised their children on farming and ranching property, commonly referred to as the Horob Family Farm, located in North Dakota. In accordance with family tradition, the Horob Family Farm was passed from Larry's widowed mother to Larry and Jeanne in 1976. Exhibit 3, a Warranty Deed notarized and filed on or about September 17, 1976, with the Register of Deeds Office in Williams County, reflects that Celia Horob, Larry's mother, conveyed to Larry and Jeanne, Celia Horob's interest in:

> The West Half of the Northwest Quarter (W½NW¼), the West Half of the Southwest Quarter (W½SW¼), of Section Fourteen (14); the Northwest Quarter (NW¼), the Southwest Quarter (SW¼), the Southeast Quarter (SE¼) of Section Twenty-three (23); the East Half of the Northwest Quarter (E½NW¼), the East Half of the Southwest Quarter (E½SW¼) of Section Twenty-five (25), ALL in Township One Hundred Fifty-six (156) North, Range One Hundred Four (104) West of the Fifth Principal Meridian, Williams County, North Dakota, EXCEPTING AND RESERVING unto the grantor an undivided one-half right, title and interest in and to all oil, gas and other minerals in and under and that may be produced from said described premises.

7

Larry, Jeanne, James, Laurie Garbel and Tami L. Nelson testified that the Horob family

subscribed to the family tradition that "the boy who stays on the farm gets to keep the farm."

During their marriage, Larry and Jeanne also acquired additional property. For example,

Larry and Jeanne purchased in January of 1979:

> An undivided one-sixth (1/6) interest in and to the Southeast Quarter (SE¼) of
> Section Eleven (11) in Township One Hundred Fifty-six (156) North, Range One
> Hundred Four (104) West of the Fifth Principal Meridian; excepting and reserving
> to the parties of the first part, three-fourths (3/4ths) of their undivided interest in
> and to the oil, gas, coal and other minerals in and under or that may be produced
> from said premises.

The warranty deed conveying the above property was notarized and filed with the Office of

Register of Deeds of Williams County on January 30, 1979. Exhibit 5. Larry obtained another

undivided ⅔ interest in the above property via U.S. Patent Number 33-81-0012 (as authorized by

an Order deposited in the Bureau of Land Management by an authorized officer of the Bureau of

Indian Affairs) that was recorded in the Office of Register of Deeds of Williams County on

November 20, 1980. Exhibit 6. Under a separate U.S. Patent recorded in the Office of Register

of Deeds of Williams County on May 29, 1981, Larry received another 1/10 interest in the above

property, exhibit 7, received another 1/30 interest pursuant to U.S. Patent Number 33-81-0051

filed with the Office of Register of Deeds of Williams County in December of 1981, exhibit 8,

and finally, Larry obtained the final 1/30 interest via U.S. Patent Number 33-81-0050 filed with

the Office of Register of Deeds of Williams County in December of 1981, exhibit 9. Thus, as of

December of 1981, Larry owned an undivided 100% interest in the Southeast Quarter (SE¼) of

Section Eleven (11) in Township One Hundred Fifty-six (156) North, Range One Hundred Four

(104) West of the Fifth Principal Meridian subject to the reservation of a right-of-way for ditches

or canals constructed by the authority of the United States, as provided by the Act of August 30, 1890 (26 Stat. 391; 43 U.S.C. § 945); and the reservation of three-fourths (3/4ths) of the respective interests in all coal, oil, gas, and other minerals in and under or that may be produced from said premises.

By Warranty Deed dated January 18, 1983, Larry and Jeanne acquired an undivided one-fifth (1/5) right, title and interest in and to the following real property lying and being in the County of Williams and State of North Dakota:

Township 155 North, Range 104 West, Section 2: S½SE¼.

Exhibit 10. The Warranty Deed reflected in Exhibit 10 was notarized and filed with the Office of Register of Deeds of Williams County on January 18, 1983.

James began working with Larry on the Horob Family Farm when James was 6 or 7 years old. Sometime between the ages of 10 and 15, James had learned virtually every aspect of farming. By the time James graduated from high school in 1983, he knew he wanted to farm and ranch for a living. Thus, after graduation, James stayed on at the Horob family farm, living with his parents.

At or about the time that Larry and Jeanne divorced in 1986, Larry and Jeanne deeded the following property to "Larry G. Horob, James L. Horob and Todd K. Horob as joint tenants and not as tenants in common, with right of survivorship":

TOWNSHIP 155 NORTH, RANGE 104 WEST OF 5TH P.M.
Section 2:      N½SE¼, NE¼, NW¼, SW¼
Section 10:     E½NE¼, Lots 1 and 2

TOWNSHIP 156 NORTH, RANGE 104 WEST OF 5TH P.M.
Section 11:     SE¼
Section 14:     W½W½

9

Section 23:     NW¼, S½
Section 25:     E½W½
Section 26:     NW¼, E½
Section 36:     W½

Exhibit 11.  The Warranty Deed shown in Exhibit 11 was notarized and filed with the Office of

Register of Deeds of Williams County on April 24, 1986.  Larry and Jeanne also conveyed by

Warranty Deed "their interest in real property described as Township 155 North, Range 104

West, Section 2: S½SE¼" to "Larry G. Horob, James L. Horob and Todd K. Horob as joint

tenants and not as tenants in common, with right of survivorship."  Exhibit 12.  Like the

Warranty Deed in Exhibit 11, the Warranty Deed depicted in Exhibit 12 was notarized and filed

with the Register of Deeds Office in Williams County, North Dakota on May 16, 1986.

    Todd graduated from high school in 1986 and lived at the Horob Family Farm until about

1989 or 1990, when Todd married Teresa Horob.  James married Bea in 1991, and at that time,

Bea moved to the Horob Family Farm.  James and Bea continue to live on and work the Horob

Family Farm with their three children, ages 6, 12 and 15.  Larry lived at the Horob Family Farm

until around the time that he and Jeanne divorced in 1986, at which time Larry moved to

Williston, North Dakota.

    Following Todd's graduation from high school, but prior to the date that Jim married Bea,

"Larry Horob, Jim Horob and Todd Horob" purchased, pursuant to a Deed notarized and filed on

March 9, 1987, with the Register of Deeds Office in Williams County, North Dakota, the

following real property:

    The E½SE¼ and Government Lots 3 and 4 of Section 10 in Township 156 North,
    Range 104 West of the Fifth Principal Meridian, Williams County, North Dakota,
    containing 153.72 acres, more or less, according to the Government survey
    thereof.

10

Exhibit 13. "Larry G. Horob, James L. Horob and Todd K. Horob as joint tenants and not as tenants in common with right of survivorship" acquired, via Quit Claim Deed from First National Bank & Trust Co. of Williston, all the right, title and interest in and to the following described land situated in the County of Williams and State of North Dakota:

> Township 155 North, Range 104 West
> Section 13:    NW¼
> Containing 160 acres, more or less.

Exhibit 14. The Quit Claim Deed between First National Bank & Trust Co. of Williston and Larry, James and Todd was notarized and filed with the Register of Deeds Office in Williams County, North Dakota on April 7, 1987. Two days later, on April 9, 1987, another Quit Claim Deed between First National Bank & Trust Co. of Williston, party of the first part, and James and Clenton P. Horob, as tenants in common, was recorded with the Register of Deeds Office in Williams County, North Dakota, conveying all the following tract or parcel of land in Williams County, North Dakota to Larry and Clenton P. Horob:

> A parcel of land located in the NW¼NE¼ of Section 12, Township 154 North, Range 101 West, more particularly described as follows: Beginning at a point 16 feet east of the southwest corner of NW¼NE¼ of said Sec. 12; thence north 0º02' east, parallel to and 16 feet from the north-south one-quarter line of said Sec. 12 a distance of 631.7 feet to a point; thence north 89º39' east a distance of 337 feet; thence north 0º12' west a distance of 150 feet to a point on the south line of the Mattison Subdivision; thence north 89º43' east along the south line of the Mattison Subdivision extended a distance of 969.2 feet to the east line of said NW¼NE¼ of Sec. 12; thence south 0º6' east, along said east line of NW¼NE¼ a distance of 781.2 feet to the southeast corner of said NW¼NE¼; thence south 89º40' west along the south line of said NW¼NE¼ of Sec. 12 a distance of 1307.8 feet to the point of beginning, except those parts thereof heretofore deeded and conveyed by warranty deeds recorded in the office of the Register of Deeds of said county in Book 209 of Deeds at page 5 as document No. 402091; Book 209 of Deeds at page 438 as document no 403988; Book 209 of Deeds at page 473 as document no. 404253; and Book 210 of Deeds at page 367 as document no. 406304, containing 19.58 acres, more or less.

11

Exhibit 15. Larry's interest in such property was transferred to Larry, James and Todd, as joint tenants with right of survivorship, via a Quit Claim Deed that was notarized and recorded on June 17, 1992. Clenton P. Horob's interest in the above property was conveyed to Ruth E. Horob in August of 1990 pursuant to a Personal Representative's Deed of Distribution, exhibit 17, and was again conveyed to JoAnn Cartier, Larene Busch, Suzann Aldridge and Janice Amundson via a Personal Representative's Deed of Distribution recorded in October of 1992. Exhibit 21. The interest in such property was then transferred by Warranty Deed from JoAnn Cartier, Larene Busch, Suzann Aldridge and Janice Amundson to Todd, James and Larry, as joint tenants with right of survivorship. Exhibit 33. The Warranty Deed in Exhibit 33 was recorded with the Register of Deeds in Williams County, North Dakota on June 26, 1997.

In Warranty Deeds dated in July and August 1993, Larry, Jim and Todd, as "joint tenants and not as tenants in common", acquired all right, title and interest in and to "Township 155 North, Range 104 West, Section 11: NE¼". Exhibits 22, 23, 24, 25, 26, 27, 28, 29, 30. The Warranty Deeds that conveyed the aforementioned property were notarized and subsequently recorded with the Register of Deeds, Williams County, North Dakota on August 27, 1993. *Id.*

In an interesting transaction, Larry and Jeanne acquired by Warranty Deed from Delphine Sulsky the following real property, subject to a life estate:

> Township 155 North, Range 104 West of 5th P.M.
> Section 2:      N½SE¼, NE¼, NW¼, SW¼
> Section 10:    E½NE¼, Lots 1 and 2

Exhibit 31. Like all previous deeds, the Warranty Deed conveying the above real property was notarized on April 28, 1997, and was filed with the Register of Deeds, Williams County, North Dakota on May 22, 1997. Larry and Jeanne Quit Claim Deeded the above property to Larry,

James and Todd, as joint tenants, on December 18, 1998. The Quit Claim Deed was notarized on

December 21, 1998, and recorded with the Register of Deeds, Williams County, North Dakota on

December 21, 1998. What is particularly interesting about such conveyance is that Larry and

Jeanne acquired the property after their divorce and more peculiarly, after they had purportedly

transferred such property to Larry, James and Todd in 1986. *See* Exhibits 11 and 31.

Also in 1997, James, Todd and Larry, as joint tenants, acquired via Warranty Deed:

TOWNSHIP 155 NORTH, RANGE 104 WEST
Section 1:     NW¼

TOWNSHIP 156 NORTH, RANGE 104 WEST
Section 14:    NE¼
Section 15:    E½NE¼, Gov. Lots 1 & 2

Exhibit 34. The Warranty Deed conveying the above property was notarized on September 8,

1997, and was recorded with the Register of Deeds of Williams County, North Dakota on

September 15, 1997.

Later, in April of 1999, a husband and wife granted, bargained, sold, conveyed, warranted

and confirmed by Warranty Deed to James, Todd and Larry, as joint tenants, the following real

property situated in Williams County, North Dakota:

TOWNSHIP 156 NORTH, RANGE 104 WEST of 5TH P.M.
Section 13:    NW¼
Section 22:    E½NE¼; Lots 1 and 2

Exhibit 38. The above Warranty Deed was notarized in April of 1999 and was recorded with the

Register of Deeds, Williams County, North Dakota on April 29, 1999. Once again, Larry, James

and Todd, as joint tenants with right-of-survivorship acquired via Warranty Deed the following

real property:

Township 155 North, Range 103 West, 5th P.M.
Section 19: Lots 1, 2, 3, 4, (140.24) SE¼NW¼ (4), E½SW¼ (80)

Township 155 North, Range 104 West, 5th P.M.
Section 24: E½NE¼ (80), E½SE¼ (80), E½W½SE¼ (40)

Exhibit 41.  The Warranty Deed shown in Exhibit 41 was notarized on July 31, 2003, and

recorded with the County Recorder, Williams County, North Dakota, on July 31, 2003.  All of

the property discussed this far is referred to by the parties as the joint tenancy property.

As for the property described by the parties as the "Horob Livestock property," it appears

that Larry caused to be filed on November 19, 1990, at 5:18 p.m., a Deed of Personal

Representative dated October 19, 1990, that conveyed to Larry the following real property

located in Williams County, North Dakota:

The Lot 10 in Block 10 of Bruegger Second Addition to the City of Williston,
North Dakota, according to the recorded Plat thereof (the foregoing premises are
situated at 614 1st Ave. East in Williston, North Dakota.

Exhibit 18.  The house located at 614 1st Ave. East was apparently the home that Larry moved

into when he left the Horob Family Farm in 1986.  On November 19, 1990, at 5:19 p.m., Larry

recorded a Quit Claim Deed that conveyed the above home in Williston, North Dakota to Horob

Livestock, Inc.  Thus, Larry owned the home located in the Bruegger Second Addition all of one

minute.  Although the home was transferred to Horob Livestock, Inc. in 1990, Larry continues to

live in the home to this date.

Also, in 1987, as reflected in Exhibit 16, Todd acquired from the Williston Cooperative

Credit Union:

An undivided ¼ interest in that part of the NW¼ of the NE¼ of Section 12,
Township 154 North, Range 101 West, described as follows: Commencing at a
point 671.1 feet East of the Quarter Section corner between Sections 1 and 12 in

14

said Township and Range, continuing thence East a distance of 655.2 feet; thence South at right angles 538 feet; thence West at right angles 655.2 feet; thence North at right angles 538 feet to the point of beginning, containing 8.09 acres, more or less.

The Warranty Deed conveying the undivided ¼ interest in the above property was notarized and then later recorded on June 3, 1997. In a Warranty Deed dated February 26, 1997, Horob Livestock, Inc. acquired, for the sum of $10.00 an additional undivided one-half interest in the same property set forth in Exhibit 16. Exhibit 32. The Warranty Deed conveying the one-half interest in said real property was notarized on March 6, 1997 and was recorded with the Register of Deeds, Williams County, North Dakota on June 9, 1997. The aforementioned parcel, owned ¼ by Todd and ½ by Horob Livestock, Inc., is referred to as the "8 acre parcel".

Also in 1997, Horob Livestock, Inc. acquired by Warranty Deed all right, title and interest in and to the following real property, consisting of 12.70 acres, more or less, located in Williams County, North Dakota:

TOWNSHIP 154 NORTH, RANGE 101 WEST of 5TH P.M.
Section 19:    SE¼

Exhibit 35. The Warranty Deed depicted in Exhibit 35 was notarized, and was recorded with the Register of Deeds of Williams County, North Dakota on March 5, 1998.

On April 28, 2000, Todd, James and Larry signed a North Dakota Open-Ended Mortgage with Farm Credit Service of North Dakota, PCA, which mortgage was not to exceed $1,001,000.00. Exhibit 39. The following land was given as security for the Open-Ended Mortgage, to-wit:

Williams County, State of North Dakota
Township 155 North, Range 104 West

15

Section 1: NW1/4
Section 10: Lots 1 & 2, E1/2NE1/4
Section 11: NE1/4
Section 13: NW1/4

Township 156 North, Range 104 West

Section 10: Lots 3 & 4, E1/2SE1/4
Section 13: NW1/4
Section 14: NE1/4
Section 15: Lots 1 & 2, E1/2NE1/4
Section 22: Lots 1 & 2, E1/2NE1/4

Subject to existing highways, easements, and rights of way of record.
The above described property contains 1404 acres, more or less.

The land given as security for the mortgage was mostly land that Larry, James and Todd acquired on March 9, 1987, or thereafter. The one parcel of land that was given as security that may not have been acquired on or after March 9, 1987, was the real property in the East Half of the Northeast Quarter (E½NE¼), Lots 1 & 2 of Section Ten (10), Township 155 North, Range 104 West of the Fifth Principal Meridian, Williams County, North Dakota. As noted earlier, the aforementioned property was conveyed by Delphine Sulsky to Larry and Jeanne by Warranty Deed dated April 28, 1997, and recorded May 22, 1997, and was also purportedly conveyed by Larry and Jeanne to Larry, James and Todd by Warranty Deed dated and recorded April 24, 1986.

Larry, James and Todd entered into a second North Dakota Mortgage with Farm Credit Services of North Dakota, FLCA on September 30, 2004. Exhibit 42. The Mortgage secured repayment of indebtedness in the principal sum of $99,000.00 and was secured by the following described real property:

Township 156 North, Range 104 West

16

Section 13: NW1/4
Section 14: NE1/4
Section 15: Lots 1 & 2, E1/2NE1/4

It appears from a partial release dated and recorded in October of 2004 that the property that served as collateral for the April 28, 2000, mortgage was released, and thus served only as collateral for the September 30, 2004, mortgage.[2]

Thereafter, via a Quit Claim Deed dated March 7, 2006, and recorded that same date, Larry, James and his spouse Bea, and Todd and his spouse Teresa, transferred the following property to James:

Township 155 North, Range 103 West
Section 19: E½SW¼, SE¼NW¼, Lots 1, 2, 3 and 4

Township 154 North, Range 101 West
Section 12: 655.2' X 538' in E½NW¼NE¼, NW¼NE¼, except deeded parts
Section 19: Sublot 1 in S½SE¼

Township 156 North, Range 104 West
Section 10: E½SE¼, Lots 3 & 4
Section 11: SE¼
Section 13: NW1/4
Section 14: W½NW¼, W½SW¼, NE¼
Section 15: Lots 1 & 2, E1/2NE1/4
Section 22: Lots 1 & 2, E1/2NE1/4
Section 23: NW¼, SW¼, SE¼
Section 25: E½NW¼, E½SW¼
Section 26: NW¼, NE¼, SE¼ except deeded parts, S½SE¼SE¼SE¼
Section 36: NW, SW¼

---

[2] Pursuant to an Order entered October 23, 2007, the Court granted Farm Credit Service of North Dakota, PCA relief from the automatic stay to pursue its nonbankruptcy remedies because the Court determined that Farm Credit Service of North Dakota, PCA was not adequately protected by an equity cushion. In particular, the appraised value of such property was $496,496.00 while Farm Credit Service of North Dakota, PCA was owed $452,048.60 plus interest, costs and fees. According to Farm Credit Service of North Dakota, PCA, interest accrues at the rate of $98.07 per day.

17

Township 155 North, Range 104 West
Section 1: NW1/4
Section 2: SW¼, NW¼, N½SE¼, S½SE¼
Section 10: Lots 1 & 2, E1/2NE1/4
Section 11: NE1/4
Section 13: NW1/4
Section 24: E½NE¼, SE¼, except W½W½SE¼

City of Williston
The Lot 10 in Block 10 of Bruegger Second Addition to the City of Williston, North Dakota, according to the recorded Plat thereof (the foregoing premises are situated at 614 1st Ave. East in Williston, North Dakota

Exhibit 44. Larry, James and his spouse Bea, and Todd and his spouse Teresa, also transferred to James, via Quit Claim Deed recorded March 20, 2006, their interest in

Township 155 North, Range 104 West
Section 2: NE¼

Exhibit 46.

Finally, Todd, on behalf of Horob Livestock, Inc., transferred the following property, via Quit Claim Deed recorded March 8, 2006, to James, all Horob Livestock, Inc.'s right title and interest to the following real property:

Township 154 North, Range 101 West
Section 12: E½NW¼NE¼
Section 19: Sublot 1 in S½SE¼

City of Williston
The Lot 10 in Block 10 of Bruegger Second Addition to the City of Williston, North Dakota, according to the recorded Plat thereof (the foregoing premises are situated at 614 1st Ave. East in Williston, North Dakota

Exhibit 45.

Exhibit 47 is a copy of a Lis Pendens filed by Wells Fargo with respect to property that was, per the records of the Register of Deeds of Williams County, North Dakota, owned by

18

Larry. Similarly, Exhibits 48 and 49 are copies of Notices of Bankruptcy Estates Interest in Real Property filed by the Trustee in this case with respect to property that was, of record, owned by Horob Livestock, Inc., and Exhibit 50 is a copy of a Notice of Bankruptcy Estates Interest in Real Property with respect to property that was owned, per the records of the Register of Deeds of Williams County, North Dakota, owned by Todd.

The various transactions discussed above, and as reflected in Exhibits 3 through 50, were summarized by Jerry Grev, the owner of Northwest Abstract & Title, Inc., in a Memorandum of Title admitted into evidence as Exhibit 1.

The transfer of all of Todd, Larry and Horob Livestock, Inc's property to James via the above three Quit Claim Deeds is what prompted the Trustee to commence the instant Adversary Proceeding. However, James counters that the transfer of all property by Todd, Larry and Horob Livestock, Inc. to James in 2006 was merely a precautionary measure because such property had previously been transferred to James as a result of various deeds that were neither notarized nor recorded. See Exhibits A, B, D, H, L, O and S.

The first document referred to by James is entitled "Quit Claim Deed Land and Minerals". Exhibit A. The document was signed by Larry, James, Todd and a now deceased witness on November 27, 2000. Such deed does not contain any words of conveyance, other than "QUIT CLAIM DEED IS TO JAMES L. HOROB", but identifies the following property:

Township 154 North, Range 101 West
Section 12: E½NW¼NE¼, NW¼NE¼, Except Deeded parts

City of Williston
The Lot 10 in Block 10 of Bruegger Second Addition to the City of Williston, North Dakota, according to the recorded Plat thereof (the foregoing premises are situated at 614 1st Ave. East in Williston, North Dakota

Township 156 North, Range 104 West
Section 10: E1/2SE1/4, Lots 3 & 4
Section 11: SE¼
Section 13: NW1/4
Section 14: W½NW¼, W½SW¼, NE¼
Section 15: Lots 1 & 2, E1/2NE1/4
Section 22: Lots 1 & 2, E1/2NE1/4
Section 23: NW¼, SW¼SE¼
Section 25: E½NW¼, E½SW¼
Section 26: NW¼, NE¼, SE Except Deeded Parts, S½SE¼SE¼SE¼
Section 36: NW¼, SW¼

Township 155 North, Range 104 West
Section 1: NW1/4
Section 2: SW¼, NW¼, N½SE¼, S½SE¼, NE¼
Section 10: E1/2NE1/4, Lots 1 and 2
Section 11: NE1/4
Section 13: NW¼

As previously noted, the document shown in Exhibit A was signed by Larry, James and Todd. However, the document makes no reference to Horob Livestock, Inc. and it does not appear that Todd and James signed the document in any capacity other than as individuals. Furthermore, the document in Exhibit A was neither notarized nor recorded.

The second document referenced by James is also entitled "QUIT CLAIM DEED".

Exhibit B. The second document is signed by Larry and James, is dated January 7, 2002, and according to James, purports to transfer to James all Larry's interest in:

Township 156 North, Range 104 West
Section 10: E½SE¼, Lots 3 & 4
Section 11: SE¼
Section 13: NW1/4
Section 14: W½NW¼, W½SW¼, NE¼
Section 15: Lots 1 & 2, E1/2NE1/4
Section 22: Lots 1 & 2, E1/2NE1/4
Section 23: NW¼, SW¼SE¼
Section 25: E½NW¼, E½SW¼

20

Section 26: NW¼, NE¼, SE¼ except deeded parts, S½SE¼SE¼SE¼
Section 36: NW¼, SW¼

<u>Township 154 North, Range 101 West</u>
Section 12: 655.2' + 538' in E½NW¼NE¼, NW¼NE¼, except Deeded parts

<u>Township 155 North, Range 104 West</u>
Section 1: NW1/4
Section 2: SW¼, NW¼, N½SE¼, S½SE¼, NE¼
Section 10: E1/2NE1/4, Lots 1 and 2
Section 11: NE1/4
Section 13: NW¼

The above document makes reference that Larry "will transfer all land and minerals to James" and further provides that Larry is making a "binding contract" with James because James "stayed on the farm." The document goes on to provide that "the Deed's [sic] will be transfered [sic] later by quit claim deed to James L. Horob". Exhibit B. Like Exhibit A, the document in Exhibit B was never notarized or recorded.

In a subsequent document titled "Quit Claim Deed" and dated December 23, 2002, Todd and James purport to "transfer" the following "property to Jim Horob for money that is owed to him:"

Lot 10 in Block 10 of Bruegger Second Addition
614 1ˢᵗ Avenue E. Gray house and garage

<u>Township 155 North, Range 104 West</u>
Section 1: NW¼
Section 2: SW¼, NW¼, N½SE¼, S½SE¼, NE¼
Section 10: E½NE¼, Lots 1 and 2
Section 11: NE¼
Section 13: NW¼

<u>Township 156 North, Range 104 West</u>
Section 36: NW¼, SW¼
Section 25: E½NW¼, E½SW¼
Section 26: NW¼, NE¼, SE Except deeded parts, S½SE¼SE¼SE¼

21

Section 22: Lots 1 & 2, E½NE¼
Section 23: NW¼, SW¼SE¼
Section 10: E½SE¼, Lots 3 & 4
Section 11: SE¼
Section 13: NW1/4
Section 14: W½NW¼, W½SW¼, NE¼
Section 15: Lots 1 & 2, E½NE¼

Township 154 North, Range 101 West
Section 12: 655.2' + 538' in E½NW¼NE¼, NW¼NE¼, except deeded parts
Section 19: Sublot 1 in S½ SE¼ and all fixtures on property scale, feeders, panels
      buildings and everything

Exhibit D. Although James and Todd titled the document in Exhibit D a "Quit Claim Deed" the document goes on to provide that "[i]f Todd K. Horob and Horob Livestock Inc has not paid James L. Horob this is a contract between the parties involed [sic]. Todd Horob & Horob Livestock Inc. and Jim Horob have made this contract together. Land and minerals will be transfered [sic] at a later Date with a quit Claim Deed." Similar to Exhibits A and B, Exhibit D did not contain a notary seal and was never recorded.

Subsequent to the signing of Exhibit D, Todd and James once again signed a document titled "Quit Claim Deed" on December 9, 2004. Exhibit H. The document in Exhibit H is substantially similar and obviously supersedes the document depicted in Exhibit D. The document in Exhibit H once again recites that Todd and Horob Livestock, Inc. "will transfer all this property to James L. Horob for money that is owed to Jim for feed & pasture rent:"

Township 155 North, Range 103 West
Section 19: E½SW¼, SE¼NW¼, Lots 1, 2, 3 and 4

Township 154 North, Range 101 West
Section 12: 655.2' X 538' in E½NW¼NE¼, NW¼NE¼, except deeded parts
Section 19: Sublot 1 in S½SE¼ and all fixtures on property of the fifth principal meridian. Scales, feeders, panels, buildings, everything.

22

Township 156 North, Range 104 West
Section 10: E1/2SE1/4, Lots 3 & 4
Section 11: SE¼
Section 13: NW1/4
Section 14: W½NW¼, W½SW¼, NE¼
Section 15: Lots 1 & 2, E1/2NE1/4
Section 22: Lots 1 & 2, E1/2NE1/4
Section 23: NW¼, SW¼, SE¼
Section 25: E½NW¼, E½SW¼
Section 26: NW¼, NE¼, SE¼ except deeded parts, S½SE¼SE¼SE¼
Section 36: NW, SW¼

Lot 10 in Block 10 of Brueggers Second Addition
614 1ˢᵗ Avenue E.  Gray house and garage

Township 155 North, Range 104 West
Section 1: NW1/4
Section 2: SW¼, NW¼, N½SE¼, S½SE¼, NE¼
Section 10: E½NE¼, Lots 1 and 2
Section 11: NE¼
Section 13: NW¼
Section 24: E½NE¼, SE¼, except W½W½SE¼

Like the document in Exhibit D, the document dated December 9, 2004, once again provides that "[i]f Horob Livestock Inc or Todd K. Horob don't get money paid to Jim Horob this property and all minerals all transfer to Jim Horob.  This is a contract between James L. Horob and Horob Livestock Inc and Todd K. Horob."  Exhibit H.  Once again, Exhibit H was neither notarized nor recorded.

On July 30, 2005, Todd and James signed another document titled "Quit Claim Deed," which document was this time witnessed by Laurie Garbel.  Exhibit L.  The July 30, 2005, document sets forth all the property previously identified in Exhibits D and H but this time provides that "Horob Livestock Inc. and Todd K. Horob are Quit Claim Deeding all land and minerals and all fixtures on property to James L. Horob for money that is owed from Horob

23

Livestock, Inc and Todd K. Horob to Jim Horob. This is a contract between Horob Livestock, Inc and Todd K. Horob and James L. Horob. James L. Horob will get all this property for money that is owed to him by Horob Livestock, Inc and Todd K. Horob." Like the documents shown in exhibits A, B, D and H, the document in Exhibit L does not contain a notary seal and was never recorded.

Also on July 30, 2005, Larry and James signed a separate "Quit Claim Deed" that was, like Exhibit L, witnessed by Laurie Garbel. In the document at Exhibit S, Larry purported to "give all my interest" in the following real property to James:

Township 155 North, Range 103 West
Section 19: E½SW¼, SE¼NW¼, Lots 1, 2, 3 and 4

Township 156 North, Range 104 West
Section 10: E½SE¼, Lots 3 & 4
Section 11: SE¼
Section 13: NW1/4
Section 14: W½NW¼, W½SW¼, NE¼
Section 15: Lots 1 & 2, E½NE¼
Section 22: Lots 1 & 2, E½NE¼
Section 23: NW¼, SW¼, SE¼
Section 25: E½NW¼, E½SW¼
Section 26: NW¼, NE¼, SE¼ except deeded parts, S½SE¼SE¼SE¼
Section 36: NW¼, SW¼

Township 155 North, Range 104 West
Section 1: NW¼
Section 2: SW¼, NW¼, N½SE¼, S½SE¼, NE¼
Section 10: E½NE¼, Lots 1 and 2
Section 11: NE¼
Section 13: NW¼
Section 24: E½NE¼, SE¼, except W½W½SE¼

Exhibit S. The document in Exhibit S also includes, at the very end of the document:

Township 154 North, Range 101 West
Section 12: 655.2' + 538' in E½NW¼NE¼, NW¼NE¼, EXCEPT DEEDED PARTS.

24

The document also provides, immediately above the signatures, the following language: "MY

AGREEMENT IS WHO STAYS ON THE FARM GETS THE FARM.  THIS A BINDING

CONTRACT FOR AS LONG AS I LIVE AND HOLDS GROUND UNTIL I CHANGE AN

AGREEMENT LIKE THIS.  THE DEED'S WILL TRANSFERED TO JAMES L. HOROB."

The final document that bears the title "Quit Claim Deed" was signed by James and Todd

on January 6, 2006, exhibit O, and reads"

I Todd K. Horob & Horob Livestock Inc give all property to James L. Horob for the
money that is owed to him.  All interest of land and minerals and fixtures on property[.]

Township 155 North, Range 103 West
Section 19: E½SW¼, SE¼NW¼, Lots 1, 2, 3 and 4

Township 154 North, Range 101 West
Section 12: 655.2' X 538' in E½NW¼NE¼, NW¼NE¼, except deeded parts
Section 19: Sublot 1 in S½ SE¼ and all fixtures on property of the fifth principal
meridian

Township 156 North, Range 104 West
Section 10: E½SE¼, Lots 3 & 4
Section 11: SE¼
Section 13: NW1/4
Section 14: W½NW¼, W½SW¼, NE¼
Section 15: Lots 1 & 2, E½NE¼
Section 22: Lots 1 & 2, E½NE¼
Section 23: NW¼, SW¼SE¼
Section 25: E½NW¼, E½SW¼
Section 26: NW¼, NE¼, SE except deeded parts, S½SE¼SE¼SE¼
Section 36: NW¼, SW¼

Township 155 North, Range 104 West
Section 1: NW¼
Section 2: SW¼, NW¼, N½SE¼, S½SE¼, NE¼
Section 10: E½NE¼, Lots 1 and 2
Section 11: NE¼
Section 13: NW¼
Section 24: E½NE¼, SE¼ except W½ W½ SE¼

25

Lot 10 in Block 10 of Brueggers Second Addition
614 1st Avenue E.  Gray house and garage

James and Larry testified that the so-called quit claim deeds shown in Exhibits A, B, D, H, L, O and S were entered into because of money that Larry, Todd and Horob Livestock, Inc. owed to James.  For instance, James' Exhibit C is an invoice for 200 cow calf pairs that were sold for $200,000.00.  The bottom of the invoice contains a notation that "James L. Horob cow money went into Horob Livestock Inc account.  Horob Livestock Inc owes this to Jim Horob.  If not paid Jim Horob takes all Todd Horob interest in Farm land & Farm assetts [sic]."

Exhibit E is an invoice dated November 1, 2003, in the amount of $87,960.00 for pasture rent.  The November 1, 2003, invoice provides: "If not paid Todd Horob or Horob Livestock Inc will transfer land over to Jim Horob.  Section 19: Sublot 1 in S½ SE¼ and all fixtures[,] Section 12: 655.2' X 538' in E½NW¼NE¼, NW¼NE¼, except deeded parts and all fixtures.  Lot 10 in Block 10 of Brueggers Second Addition[,] all land in Bull Butte Township and all mineral[.] All land in Hebron Township and all minerals."  Thereafter, in February of 2004, Larry, James, Todd and Horob Livestock, Inc. entered into the following agreement:

> Todd Horob & Horob Livestock Inc agree to pay loan for Larry Horob at Wells Fargo Bank to get feed grain & feed and cash from Jim Horob $175,000.00 will be paid by Todd Horob, Horob Livestock Inc from help of James L. Horob.  This is a contract between Todd Horob & Jim Horob, Larry Horob.  Larry Horob & Todd Horob [and] Horob Livestock Inc owe this to Jim Horob.

In December of 2004, Todd and James prepared another invoice on a Horob Livestock, Inc. invoice indicating that Todd and Horob Livestock, Inc. owed James $217,560.00 for feed and pasture rent.  Exhibit G.  The December 2004 invoice provides that if the invoice was not paid, Todd and Horob Livestock, Inc. would transfer all their farm land and livestock equipment to

26

James. Exhibit G is dated December 9, 2004, as is the "Quit Claim Deed" shown in Exhibit H.

In 2005, James and Todd entered into similar "barter" deals. *See* Exhibit I (concerning a purchase of hay "Todd Horob will pay to Jim Horob or Barter it some way" ); and Exhibit K (relating to hay for cattle, "[t]his is a barter deal between Jim and Todd"). The monies owed per Exhibits C, E, G, I or K and M were summarized by Todd and James on Exhibit N wherein Todd and James determined, in a document dated December 19, 2005, that Horob Livestock, Inc. and/or Todd owed James a total of $711,057.50. Exhibit N also provides that "Horob Livestock Inc & Todd Horob if cannot pay gives James L. Horob all interest in land & livestock equip. All farm interest at 15401 61st NE - Williston, ND 58801 and land in Bull Butte Township and land in Hebron Township[,] Feedlot - yard #577262 [and] Old feedlot #570985 - #502070."

The Trustee and Wells Fargo maintain that the so-called quit claim deeds shown in Exhibits A, B, D, H, L, O and S are not valid and did not transfer the property at issue, particularly with respect to third parties. In support of their position, the Trustee and Wells Fargo argue that the actions of Larry, James and Todd between November of 2000 and March of 2006 show that Larry, James and Todd considered themselves, consistent with the records of the Register of Deeds of Williams County, North Dakota, to be joint tenancy owners of the property at issue in this Adversary Proceeding.

As an illustration, in 2003 Larry and Todd sought loans from Wells Fargo on behalf of Horob Livestock, Inc. An Agricultural Financial Statement was prepared on behalf of Horob Livestock, Inc., that was signed by Todd on January 21, 2003. Said Agricultural Financial Statement shows livestock valued at $254,500.00, machinery and equipment valued at $346,000.00 and real property, consisting of two stockyards, valued at $275,000.00. Similarly,

27

in an Agricultural Financial Statement signed by Larry on April 30, 2005, Larry asserts that he owns farmland and pasture land valued at $2,100,000.00. On March 14, 2003, both Larry and Todd filed unlimited Commercial Guaranties on behalf of Horob Livestock, Inc. The Commercial Guaranties guaranteed various loans that Horob Livestock, Inc., obtained from Wells Fargo, including three separate loans evidenced by Promissory Notes dated June 23, 2005, in the amounts of $3,700,000.00, $950,000.00, and $500,000.00. Wells Fargo appears to also have extended a $700,000.00 revolving line of credit to Horob Livestock, Inc. on September 22, 2005.[3] Under Agreements to Provide Insurance signed by Todd and Larry, and Notice of Insurance Requirements, also signed by Todd and Larry, "Horob Partnership and Larry Horob" insured "the dwellings, machinery, implements, personal property, etc. located at: 1. SECTION 26-156-104, WILLIAMS COUNTY; 2. SECTION 26-156-106, WILLIAMS COUNTY; and 3. 614 1st AVENUE EAST, WILLISTON" through Farmers Union Mutual Insurance Company, for the period from February 5, 2006, through February 5, 2007.

In addition to borrowing money, in December 7, 2004, Larry, James and Todd entered into an Oil and Gas Lease with Sundance Oil & Gas, Inc., agreeing to lease the following real property to Sundance Oil & Gas, Inc. for purposes of mining:

Township 155 North, Range 104 West
Section 2: ALL

Township 156 North, Range 104 West
Section 11: SE4
Section 14: W2W2
Section 23: S2, NW4

---

[3] The parties never explained what happened to all the money that Todd, Larry and Horob Livestock, Inc. borrowed from Wells Fargo, but one witness made a comment at the trial that Todd lost over $1 million in livestock futures.

28

Section 25: E2W2
Section 26: N2, SE4

As a result of the Sundance Oil & Gas, Inc. lease, in 2005, Larry reported $64,133.00 of oil lease income while James reported $56,133.00 of oil lease income and Todd reported $56,133.00 of income from "rental real estate, royalties, partnerships, S corporations, trusts, etc."

Both Todd and Horob Livestock, Inc. filed their bankruptcy petitions on March 24, 2006. Todd's original Summary of Schedules shows $147,847.50 in assets and $5,881,000.00 in liabilities. Of the total liabilities, $5,600,000.00 is owed to Wells Fargo for "cows"[4] The only real property listed by Todd on his Schedule A is his personal residence which he co-owns with his spouse, Teresa. Also, per Todd's original Schedule B, Todd reported that he owned personal property valued at $78,347.50. Todd amended his Schedule B in April of 2006 to add $106,000.00 of automobiles, trucks, trailers, and other vehicles and accessories and amended his Schedule B again in October of 2006 to disclose his one-half interest in a 2001 Lincoln. Also in April of 2006, Todd amended his Statement of Financial Affairs to disclose, in response to Question 3(c) which requires debtor to list "all payments made within one year" of the petition date, the March 7, 2006, and March 20, 2006, payments made to James by way of property transfers. Todd similarly amended his response to Question 10 to include the property transfers to James as property transferred within two years of Todd's March 24, 2006, petition date. Finally, after amending other various schedules, his petition and the Statement of Financial Affairs for a second time, Todd amended his Schedule G in October of 2006 to disclose the oil and gas lease with Sundance Oil & Gas, Inc.

---

[4] Wells Fargo filed a Proof of Claim in Todd's bankruptcy asserting an unsecured claim of $5,561,169.61 against Todd.

29

Horob Livestock, Inc.'s original Summary of Schedules discloses assets of $194,250.00 and liabilities of $5,861,000.00. Like Todd, $5,600,000.00 of the liabilities is owed to Wells Fargo for "cows." In April of 2006, Horob Livestock, Inc. amended its Schedule B to add a $250,000.00 liquidated debt and once again amended its Schedule B at a later date to disclose other assets valued slightly in excess of $1,800.00. Horob Livestock, Inc. also amended its Statement of Financial Affairs on one occasion, but the Court does not see where Horob Livestock, Inc. disclosed the March 7, 2006, property transfer to James.

Horob Livestock, Inc. is indebted to Wells Fargo pursuant to the terms of three Promissory Notes executed by Todd, as President of Horob Livestock, Inc. The three Promissory Notes are dated June 23, 2005, and are personally guaranteed by Todd and Larry. *See* Exhibits 130 and 131. The three Promissory Notes are in the amounts of $3,700,000.00, $950,000.00 and $500,000.00. Horob Livestock, Inc. is also indebted to Wells Fargo on a separate Promissory Note dated September 16, 2005. As security for the above Promissory Notes, Todd, as President of Horob Livestock, Inc., executed and delivered to Wells Fargo a security agreement in which Horob Livestock, Inc. granted Wells Fargo a security interest in all farm products, including without limitation, all (1) livestock, born or unborn, (2) supplies used or produced in farming operations, and (3) products of crops or livestock in un-manufactured states. The security agreement also covers all equipment, accessions, accounts, inventory, and general intangibles (including payment intangibles and software), instruments (including promissory notes), documents, deposit accounts, all attachments, accessories, tools, parts, supplies, increases, and all additions to, replacements of and substitutions for any of the property or goods, any insurance refunds on any of the foregoing property and goods, together with all products and proceeds of

30

any of the property or goods.  Additionally, as security for the indebtedness set forth in the

above-discussed promissory notes, Larry executed and delivered to Wells Fargo a security

agreement granting Wells Fargo a security interest in all farm products, including without

limitation, all (1) livestock, born or unborn, (2) supplies used or produced in farming operations,

and (3) products of crops or livestock in un-manufactured states.  The security agreement also

covers all equipment, accessions, accounts, inventory, and general intangibles (including

payment intangibles and software), instruments (including promissory notes), documents, deposit

accounts, all attachments, accessories, tools, parts, supplies, increases, and all additions to,

replacements of and substitutions for any of the property or goods, any insurance refunds on any

of the foregoing property and goods, together with all products and proceeds of any of the

property or goods. The debt of $5,861,000.00 owed by Horob Livestock, Inc. to Wells Fargo,

which debt is guaranteed by Todd and Larry, is, most certainly to Wells Fargo's dismay, in

shocking contrast to the assets of $446,117.41 listed by Horob Livestock, Inc. in its Schedule A

and amended Schedule B.

      After the voluntary petitions were filed on behalf of Todd and Horob Livestock, Inc.,

Wells Fargo filed on April 25, 2006, a Lis Pendens indicating that it had filed a complaint against

Larry and James for the purpose of setting aside the allegedly fraudulent transfers of all the real

property set forth in the Quitclaim Deeds recorded in March of 2006 and admitted into evidence

as Exhibits 44, 45 and 46.  The Lis Pendens filed by Wells Fargo prompted the Trustee to include

a claim against Wells Fargo in the Consolidated Amended Complaint for the avoidance and

preservation of post-petition transfers under 11 U.S.C. § 549(a) and 551.  The Trustee's claim

against Wells Fargo prompted Wells Fargo to file its cross-claim against Larry and James.

As of March 24, 2006, Todd and Teresa have three children, ages 4, 8 and 11, and jointly own their home located at 2209 First Avenue East, Williston, North Dakota. Todd's interest in the home is listed in Todd's schedules.

## DISCUSSION

The Court would note at the outset that none of the evidence, including the chain of title as reflected in the Register of Deeds in Williams County, North Dakota, suggest that Bea or Teresa Horob had any interest in the real property at issue in this Proceeding and the Court concludes that they have no interests in such property. Thus, the Court is not required to make any additional decision on such issue. The remaining issues are as follows:

1.     **Do the documents entitled Quit Claim Deeds, as reflected in Exhibits A, B, D, H, L, O and S, grant James a superior right to the real property at issue in this Proceeding over any right that the Trustee may claim in said property under the Bankruptcy Code?**

The first issue that the Court must resolve in this case is whether the unrecorded documents in Exhibits A, B, D, H, L, O and S were effective – prior to and as of July 30, 2005, – in transferring all the real property at issue in this Adversary Proceeding to James. James asserts that the unrecorded documents, referred to as quit claim deeds by James, combined with his possession of the real property was sufficient to put the Trustee and Wells Fargo on notice that James was the sole owner of all the real property at issue. The Trustee and Wells Fargo counter that the unrecorded quit claim deeds are suspicious and not authentic. In addition, the Trustee and Wells Fargo maintain that James possession of the real property was consistent with his co-tenancy ownership of the property, and thus did not put the Trustee or Wells Fargo on constructive notice of James' alleged sole ownership of said property.

32

Under the Bankruptcy Code, trustees are granted so-called "strong arm" powers under 11 U.S.C. §§ 544(a). Specifically, § 544(a)(3) gives a trustee hypothetical status as a perfected bona fide purchaser of real property from the debtor. State law determines whether a trustee's status as a bona fide purchaser will defeat the rights of persons against whom a trustee seeks to assert his or her powers. *Briggs v. Kent (In re Professional Inv. Properties of America)*, 955 F.2d 623, 627 (9th Cir. 1992), *cert. denied* 506 U.S. 818, 113 S.Ct. 63, 121 L.Ed.2d 31 (1992); *Decker v. J. Cyril Johnson Corp. Profit Sharing Plan (In re Harvey)*, 222 B.R. 888, 892-93 (9th Cir. BAP 1998); *Robertson v. Peters (In re Weisman)*, 5 F.3d 417, 420 (9th Cir.1993). In this case North Dakota law will determine whether the Trustee can avoid James' unrecorded quit claim deeds. In North Dakota, a bona fide purchaser is a purchaser who in good faith, and for value, acquires title without actual or constructive knowledge of another's rights. *Wehner v. Schroeder*, 335 N.W.2d 563, 565 (N.D.1983).

In discussing § 544(a)(3) and North Dakota's "first-in-time/first-in-right" rule for priority of interests in real property, the Bankruptcy Court for the District of North Dakota explained:

> Section 544(a)(3) vests a trustee with the rights of a bonafide purchaser of real property for value and permits the invalidation of security interests in real property which, although enforceable between the parties themselves, are not properly perfected at case commencement due to a failure to fully comply with applicable state recording laws. *In re Nies,* 183 B.R. 866, 868 (Bankr.D.N.D.1995). The question of perfection is one addressed by North Dakota law. North Dakota Century Code § 47-19-41 as relevant provides that "every conveyance of real estate not recorded shall be void as against any subsequent purchaser in good faith, and for a valuable consideration, of the same real estate ..."

*In re Wegner*, 210 B.R. 799, 801 (Bankr. D.N.D. 1997). The failure of James, Larry and/or Todd to cause the quit claim deeds to be recorded results in such deeds being void and unenforceable

as against the Trustee, who is cloaked with the status of a hypothetical bonafide purchaser.

However, assuming solely for purposes of argument that the Trustee could arguably be charged with constructive knowledge of James' claim of sole ownership in the property by virtue of his possession, under North Dakota law, James' possession of said property would not, under the facts of this case, be deemed sufficient to impugn the Trustee's good faith status. Before discussing the merits of such argument, the Court would note that James certainly cannot claim that he possessed the house located in Bruegger's Second Addition to Williston because Larry has lived in that house since 1986 and continues to live in that house today. Additionally, the testimony at the trial shows that Todd, and not James, was the person who used the Horob Livestock Property.

With respect to the joint tenancy property, as explained by the Supreme Court of North Dakota in *Earnest v. First Nat'l Bank of Crosby*, 56 N.D. 309, 217 N.W. 169, 170 (1927): "This Court has long and consistently held that open and notorious possession and occupancy of real property by another than his grantor is sufficient to charge a purchaser of real estate with knowledge of the rights of the occupant thereof." Indeed, "North Dakota law unequivocally recognizes [that] a person who has actual notice of facts sufficient to put a prudent person on inquiry about a particular fact, but who omits to inquire with reasonable diligence, is deemed to have constructive notice of the facts an inquiry would have revealed. *Erway v. Deck*, 1999 ND 7, ¶ 10, 588 N.W2d 862. However, the aforementioned general rule "does not apply where the possession of the occupant 'is entirely consistent with the record title'[.]" *Earnest*, 217 N.W. at 171, quoting *Red River Valley Land & Inv. Co. v. Smith*, 7 N.D. 236, 74 N.W. 194 (1898).

The instant case is not unlike the case of *Ildvedsen v. First State bank of Bowbells*, 24

34

N.D. 227, 139 N.W. 105 (1912), where a husband and wife owned certain real property as

tenants in common. The husband and wife divorced and the husband deeded by quitclaim deed

to the wife his interest in North Dakota real property. After the divorce and at all times relevant

in *Ildvedsen*, the wife was in continuous actual possession of the real property and resided

thereon. Unfortunately, prior to the wife recording her quitclaim deed, a creditor of the husband

obtained a judgment against the husband and caused a writ of attachment to be levied against the

husband's undivided one-half interest in the North Dakota real property. The husband's one-

half interest in the property, that was of record, was sold to satisfy the creditor's judgment. The

Supreme Court of North Dakota concluded that the attachment and execution sale were superior

to the wife's unrecorded quitclaim deed, reasoning:

> The record in the register of deeds office disclosed that plaintiff and her said
> husband were tenants in common of these lots. At no time since the giving of the
> unrecorded deed by Peter Ildvedsen to plaintiff has there been any visible or
> notorious change in the possession sufficient to impart notice to the public of such
> deed.
>
> Plaintiff's possession at all times has been perfectly consistent with the
> record title which disclosed such tenancy in common, and she is therefore
> presumed to have held such possession in subordination to the rights of her
> cotenant as thus disclosed by the public records. This is a well-established rule.
> *Wilcox v. Bank*, 43 Minn. 541, 45 N. W. 1136, 19 Am. St. Rep. 259; *Kirby v.
> Tallmadge*, 160 U. S. 379, 16 Sup. Ct. 349, 40 L. Ed. 463; *Schumacher v.
> Truman*, 134 Cal. 430, 66 Pac. 591; *Emeric v. Alvardo*, 90 Cal. 444, 27 Pac. 356;
> *Dutton v. McReynolds*, 31 Minn. 66, 16 N. W. 468; *Motley v. Jones*, 98 Ala. 443,
> 13 South. 782.
>
> Wade on Notice (2d Ed.) at § 290, states the rule as follows: "Another
> essential feature of the possession which is set up as notice to a subsequent
> purchaser is that it must be *exclusive*, at least so far as such subsequent purchaser's
> grantor is concerned. Accordingly, where a father conveyed to his son, upon
> certain conditions, an undivided one-third of a farm, which was at the time
> occupied by them as tenants in common, and the son removed from the farm
> during the lifetime of the father, who remained in sole possession, it was held that

35

the possession of the father would not be notice to parties to whom the son subsequently mortgaged his interest, unless notice could be brought home to the mortgagees, at the time such mortgage was given, not only of the father's possession, but that it was held adversely to his cotenant. This was so held upon the familiar principle that the possession of real estate by one of several tenants in common will not be construed as adverse to his cotenants, for the reason that such possession is perfectly consistent with the extent of his own interest in the land. To render his occupancy adverse to those who have an undivided interest in the premises, there must be positive and overt acts connected with his exercise of ownership such as will manifest an unmistakable intention on his part to exclude his cotenants from the enjoyment of the property; otherwise his possession will be regarded not only as a declaration of his own proprietary rights, but those of his cotenants as well."

*Ildvedsen*, 139 N.W. at 108.

Following the above law, this Court finds that James' possession of the real property was consistent with the record title and thus, James' possession does not put any party on constructive or inquiry notice that James might have an interest in said property that was contrary to what was of record in the Register of Deeds office. Therefore, the Trustee, as a bona fide purchaser, has an interest in the property that is superior to any right that James may claim by virtue of the various unrecorded quit claim deeds that were signed between November 27, 2000, and July 30, 2005.

The Court would also note that James did not mention the unrecorded deeds in his Answer filed in this Adversary Proceeding on February 9, 2007, and in fact admits that "prior to filing its bankruptcy, the Debtor owned an interest in the real estate described in Exhibit A, but the exact extent of such ownership being described as 'whole or undivided' is unknown", and further admits that James "was 50% shareholder of Horob Livestock, Inc., and therefore technically owned 50% of the described land." In his March 23, 2007, answer to Wells Fargo's cross-claim, James "affirmatively alleges that the official recording of the Deeds and the official execution of recordable Deeds is not determinative of the issue of when the transfers took place,

36

and that such transfers all took place in the ordinary course of business and financial affairs of all involved[.]" In hindsight, James' answer to Wells Fargo's cross-claim may have been the first time that James began considering his defense that was based upon the unrecorded deeds. According to the record, however, it was not until well into this Adversary Proceeding, perhaps as late as September of 2007, that James made reference to the existence of the unrecorded deeds and expressed his intent to use such deeds in contradiction to the three Quitclaim Deeds recorded in March of 2006. Thus, even if the unrecorded deeds did have some validity in this Adversary Proceeding, which they do not given the Trustee's strong-arm powers under § 544, such unrecorded deeds would be highly suspect, particularly given the fact that James waited so long to raise the deeds as a defense to the Trustee's Complaint and Wells Fargo's cross-claim.

In particular, as detailed in the Background section of this Memorandum, Larry, Todd and James were parties to numerous warranty deeds, quitclaim deeds and patents. Starting as early as 1976 and extending to at least 2003, all transfers of real property involving Larry, Todd and/or James were notarized and filed with the Register of Deeds of Williams County, yet none of the deeds relied upon by James in this Adversary Proceeding were notarized or recorded.

Finally, many of the unrecorded deeds relied upon by James provide that the actual transfer of the real property would take place at a later date by other deeds or would take place if James was not paid for various services. For instance, Exhibit B dated January 7, 2002, recites that "the Deed's [sic] will be transferred later by quit claim deed to James L. Horob." Similarly, Exhibit D dated December 23, 2002, provides that "Land and minerals will be transferred at a later date with a quit claim deed." As explained in *In re Estate of Dittus*, 497 N.W.2d 415, 417-18 (N.D. 1993):

37

The interest transferred to a grantee by a deed does not vest until there is a delivery of the deed by the grantor, NDCC § 47-09-06, and acceptance of the deed by the grantee. *CUNA Mortgage v. Aafedt,* 459 N.W.2d 801 (N.D.1990). Therefore, a deed is of no effect unless it is delivered. *E.g., Jorgenson v. Crow,* 466 N.W.2d 120 (N.D.1991). But, delivery is of no avail unless the grantor effectuates it with the intent that the deed presently pass title to the grantee. *Id.* Accordingly, "[i]f the intent is not to transfer the interest until the grantor's death, there is no present delivery and the conveyance is merely an ineffective attempt at a testamentary transfer." 6A Powell on Real Property, ¶ 898[2] at 81A-77 (Rev.Ed.1993).

The particular language contained in the unrecorded deeds combined with the fact that such deeds were not notarized or recorded leads this Court to find and conclude that such deeds were never intended to transfer a present interest in real property, but rather, merely indicated a promise by Larry and Todd to transfer such property at a future date.

   2.    **Were the transfers of real property made pursuant to the Quitclaim Deeds dated March 7, 2006, and March 20, 2007, as reflected in Exhibits 44, 45 and 46, preferential transfers that are avoidable by the Trustee under 11 U.S.C. § 547?**

Even though the Court finds that James' unrecorded quit claim deeds have no effect in this Adversary Proceeding, the property at issue was nonetheless transferred to James pursuant to three Quitclaim Deeds that were recorded on March 7, 2006, March 8, 2006, and March 20, 2006. At issue now is whether the Trustee can avoid the three transfers made in March of 2006 under 11 U.S.C. § 547. While intent or motive is not a consideration under § 547, the Trustee, as Plaintiff, must prove each and every element set forth in § 547(b), otherwise, the transfer is not avoidable as a preference. 11 U.S.C. § 547(g); *Danning v. Bozek (In re Bullion Reserve of N. Am.)*, 836 F.2d 1214, 1217 (9th Cir. 1988), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988) ("The burden of proving the existence of these elements is on the bankruptcy trustee") (citing *Grover v. Gulino (In re Gulino)*, 779 F.2d 546, 549 (9th Cir. 1985)). The

38

philosophy behind the granting of avoidance powers to the trustee under § 547 is that a creditor should not be able to gain an advantage over other creditors in the same class by getting a payment from the debtor's estate just before the debtor goes into bankruptcy.  The Ninth Circuit wrote the following summary of preferences under 11 U.S.C. § 547(b):

> The Bankruptcy Code permits a trustee to avoid any pre-bankruptcy transfer of a debtor's assets if the transfer: 1) is to or for the benefit of a creditor; 2) is for an antecedent debt owed by the debtor  before the transfer; 3) is made while the debtor was insolvent; 4) is made within 90 days of the bankruptcy filing; and 5) enables the creditor to receive more than such creditor would have if the debtor liquidated and distributed the estate to all creditors 11 U.S.C. § 547(b)(1-5).

*Mordy v. ChemCarb, Inc. (In re Food Catering & Housing, Inc.)*, 971 F.2d 396, 397 (9th Cir. 1992).

The record in this case is clear and supports the Trustee's preference claim.  James has consistently held throughout this proceeding that Todd, Larry and Horob Livestock, Inc. owed James money on obligations that were incurred prior to 2006.  Specifically, Exhibit N purports to summarize the $711,057.50 debt that Todd and Horob Livestock, Inc., owed James as of December 19, 2005, and the transfers reflected in the Quitclaim Deed dated March 7, 2006, and recorded that same date in Exhibit 44, the Quitclaim Deed dated March 7, 2006, and recorded March 8, 2006, in Exhibit 45, and the Quitclaim Deed dated March 20, 2007, and recorded that same date in Exhibit 46, were admittedly filed for the sole purpose of benefitting James, who is a purported creditor that was allegedly owed $711,057.50.  The above fact also established beyond any doubt that the March 2006 transfers were for an antecedent debt that was owed by Todd and Horob Livestock, Inc., to James prior to March of 2006.

As far as insolvency, it is apparent from the summary of assets and liabilities filed by

Todd and Horob Livestock, Inc., that both were insolvent in March of 2006 because the sum of their debts was greater than the fair market value of all their assets. 11 U.S.C. § 101(32). As referenced earlier in this Order, at or near the commencement of Todd's and Horob Livestock, Inc.'s bankruptcies, Todd had assets valued at roughly $253,847.50 while his liabilities totaled $5,881.000.00. Similarly, Horob Livestock, Inc. lists assets of $446,050.00 and liabilities of $5,861,000.00. James has not challenged the financial position of either Todd or Horob Livestock, Inc. The foregoing conclusion is consistent with 11 U.S.C. § 547(f) which reads that '[f]or purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." James, Todd and Horob Livestock, Inc., made no attempt whatsoever to rebut the foregoing presumption and, therefore, the Trustee was entitled to rely upon the presumption of insolvency. *See Pioneer Technology, Inc. v. Eastwood (In re Pioneer Technology, Inc.)*, 107 B.R. 698, 701 (9th Cir. BAP 1988).

Likewise, James does not dispute that the Quitclaim Deeds that were recorded in March of 2006 were made within 90 days of Todd's and Horob Livestock, Inc.'s March 24, 2006, bankruptcy petition dates. Accordingly, the final inquiry with respect to the Trustee's preference claim is whether the March 2006 transfers of real property to James enabled James to receive more than he would have if the property was instead liquidated and distributed to all creditors. The answer to the foregoing inquiry is quite simple. The unsecured proofs of claim filed in Todd's bankruptcy case, which claims have not been challenged, total $6,510,420.63. *See* Exhibits 71, 74 and 75. James failed to timely file a proof of claim, but if he had, James would have to share pro rata with the $6,510,420.63 in claims. According to the Summary of Land Values prepared by Roger Cymbaluk in Exhibit 119, the value of Todd's share of the property

40

owned jointly by Todd, Larry and James is $312,541.67. Assuming that James would have filed a timely proof of claim in the amount of $711,057.50 and if James shared pro rata in Todd's share of the joint tenancy property, James would have received approximately $31,254.17 as opposed to the value of real property of $312,541.67 that he actually received. A similar calculation would result in the Horob Livestock, Inc., bankruptcy. Thus the only conclusion that one can draw from the facts in this case is that the March 2006 transfers of real property enabled James to receive more than he would have received had he simply filed a proof of claim in Todd's and Horob Livestock, Inc.'s bankruptcy cases and collected his pro rata distribution.

The Trustee, by proving each of the elements set forth in § 547(b), has unequivocally shown that the transfers made by Todd and Horob Livestock, Inc. to James in March of 2006 would prevent the bankruptcy policy of equality of distribution among creditors. As a result, the Quitclaim Deeds dated March 7, 2006, and March 20, 2006, and recorded March 7, 2006, March 8, 2006, and March 20, 2006, are voided and Todd, Larry and James are returned to the positions of ownership they enjoyed on March 6, 2006 – the day prior to the date the first Quitclaim Deed was recorded.

Notwithstanding the above findings, the Court reviews § 547(c) to ascertain whether the transfer could be exempt from avoidance. It is clear that §§ 547(c)(1) and (c)(3) through (9) are not applicable. However, James' asserts in one of his pleadings that "the transfers all took place in the ordinary course of business and financial affairs of all involved". The Court is not sure whether James is referring to the alleged transfers under the unrecorded deeds or the Quitclaim Deeds that were filed in March of 2006. For purposes of completeness, the Court will presume at this juncture that such reference was to the Quitclaim Deeds recorded in March of 2006.

41

The exception at § 547(c)(2) reads: "The trustee may not avoid under this section a transfer – (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee and such transfer was (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (b) made according to ordinary business terms[.]" The Ninth Circuit Court of Appeals, in *Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com)*, 504 F.3d 775 (2007), recently discussed the exception at § 547(c)(2), prior to its amendment in 2005. Although *Healthcentral.com* is a pre-BAPCPA case, the Court's discussion of § 547(c)(2)(B), which is now § 547(c)(2)(A), and its discussion of § 547(c)(2)(C), which is now § 547(c)(2)(B), is instructive. With respect to what is now § 547(c)(2)(A), the Ninth Circuit in *Healthcentral.com* wrote:

> In this circuit the rules associated with § 547(c)(2)[A] are well-settled. *See In re Ahaza Sys., Inc.,* 482 F.3d at 1124. To satisfy § 547(c)(2)[A] the creditor must demonstrate that the relevant payments were "ordinary in relation to past practices between the debtor and [the] ... creditor." *In re Food Catering & Hous., Inc.,* 971 F.2d at 398. Effectively this breaks down into two components. First, the creditor must show a baseline of past practices between itself and the debtor. *See id.*; 5 COLLIER ON BANKRUPTCY ¶ 547.04[2][a], 547-60 (rev. 15th ed. 2006.). Second the creditor must show that the relevant payments were "ordinary in relation to [these] past practices." *In re Food Catering & Hous., Inc.,* 971 F.2d at 398. This is most commonly done by demonstrating that the relevant payments did not differ from past payments in "amount" or "form," were not the result of "unusual collection or payment activit[ies]," or did not come as a result of the "creditor [taking] advantage of the debtor's deteriorating financial condition." *Sulmeyer v. Suzuki ( In re Grand Chevrolet, Inc.*), 25 F.3d 728, 732 (9th Cir.1994). *But see In re Ahaza, Inc.,* 482 F.3d at 1129 (finding that traditional factors are non-exclusive and other factors bearing on past practices may be relevant).

*Id*. at 790. James offered no evidence with respect to the exception under § 547(c)(2)(A) and the record in this case strongly suggests that the transfers of real property by Todd, Horob Livestock,

Inc. and Larry to James in March of 2006 were not ordinary in relation to past practices and were clearly unusual forms of payment that were prompted solely by Todd, Larry and Horob Livestock, Inc.'s deteriorating financial conditions that were exacerbated by Wells Fargo's investigation into the whereabouts and existence of its collateral and Wells Fargo's collection efforts. Accordingly, § 547(c)(2)(A) affords James no relief.

The application of § 547(c)(2)(B), which is now separated from § 547(c)(2)(A) with an "or" rather than an "and", is equally "well-settled." *Id.* at 791.

> To satisfy § 547(c)(2)(C) the creditor must demonstrate that the relevant payments were "ordinary in relation to prevailing business terms." *In re Food Catering & House, Inc.,* 971 F.2d 396, 398 (9th Cir.1992). As before, this effectively breaks down into two components. First the creditor must establish the "broad range" of business terms employed by similarly situated debtors and creditors, including those in financial distress, during the relevant period. *In re Jan Weilert RV, Inc.,* 315 F.3d at 1197-98. Second, the creditor must show that the relevant payments were "ordinary in relation to [these] prevailing business terms." *See In re Kaypro,* 218 F.3d at 1074. In general, § 547(c)(2)(C) should not pose a particularly high burden for creditors. *See In re Jan Weilert RV, Inc.,* 315 F.3d at 1198 (holding only payments which are so unusual as to be "aberration[s] in the relevant industry" do not satisfy § 547(c)(2)(C)).

*Id.* As under § 547(c)(2)(A), James offered no evidence under § 547(c)(2)(B). Notably, James failed to show the business terms employed by similarly situated debtors and creditors, including those in financial distress, and James similarly failed to show that the transfers of real property were ordinary in relation to prevailing business terms. This Court highly doubts that any debtors in financial distress would transfer all their real property, that was unencumbered for the most part, to a creditor who was wholly unsecured. Section 547(c) thus provides James no relief and the transfers of property made via Quitclaim Deeds in March of 2006 must be nullified and completely avoided.

43

3. **Were the March 7, 2006, and March 20, 2007, transfers of real property, as reflected in Exhibits 44, 45 and 46, fraudulent conveyances that are avoidable by the Trustee under 11 U.S.C. § 548?**

At this juncture, the Court would, for purposes of completeness, address the Trustee's fraudulent conveyance claim. However, the evidence with respect to the Trustee's preference claim is so overwhelming that the Court sees no need to address the Trustee's fraudulent conveyance claim.

4. **Whether Larry's transfers of all his real property to James are void under North Dakota's Uniform Fraudulent Transfer Act.**

North Dakota has adopted the Uniform Fraudulent Transfer Act ("UFTA"). *See* N.D. CENT. CODE ("NDCC") §§ 13-02.1-01 to 13-02.1-10. The purpose of the UFTA is "to protect a debtor's estate from being depleted to the prejudice of the debtor's secured creditors." *Farstveet v. Rudolph*, 2000 ND 189, ¶ 19, 630 N.W.2d 24, quoting UFTA § 3, cmt.(2). Under the UFTA, a transfer may be attacked as being actually fraudulent or constructively fraudulent. *Farstveet*, 2000 ND 189, ¶ 20. For a person to benefit from the fraudulent conveyance statutes, it must be shown that a transfer has occurred and that the claimant is a creditor. *Jahner v. Jacob*, 515 N.W.2d 183, 185 (N.D. 1994). A transfer "means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." NDCC § 13-02.1-01(12). The conveyances of real property from Larry to James are clearly "transfers" as defined by North Dakota law.

Under the UFTA, a real property transfer is made "when the transfer is so far perfected that a good-faith purchaser of the asset from the debtor against whom applicable law permits the

44

transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee." NDCC § 13-02.1-06(1). Thus, a transfer is made under the UFTA upon perfection of the instrument. North Dakota is a race-notice jurisdiction and perfection takes place upon recordation of the instrument or upon notice to the purchaser of the unrecorded instrument. *See* NDCC § 47-19-19 and NDCC § 47-19-41. The unrecorded quitclaim deeds in the case *sub judice* were not disclosed to a single party and were never recorded. Consequently, they have no relevance with respect to a claim under the UFTA. For purposes of Wells Fargo's UFTA claim, the transfers from Larry to James were not perfected until the Quit Claim Deeds were recorded in March of 2006.

A creditor is "a person who has a claim." NDCC § 13-02.1-01(4) (2007). A claim is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." NDCC § 13-02.1-01(3). Because Larry guaranteed Horob Livestock, Inc.'s obligations to Wells Fargo and because Horob Livestock, Inc. has defaulted on such obligations prior to March of 2006, Wells Fargo had a claim on the date of the transfers and was, at that time, a creditor of Larry Horob.

A transfer is fraudulent as to present and future creditors if the debtor made the transfer "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor[.]" NDCC § 13-02.1-04. Because a debtor's subjective intent is difficult to determine, fraudulent intent may be established by circumstantial evidence, which includes the "badges of fraud." *O'Connor v. Lewis*, 238 Mont. 270, 276, 776 P.2d 1228 (1989); *see also Marrama v. Citizens Bank of Massachusetts (In re Marrama)*, 445 F.3d 518, 522 (1st Cir. 2006). Evidence of the "badges of

45

fraud" can lead to the inference that a fraudulent conveyance existed. *Gifford-Hill & Co. v. Stoller*, 221 Neb. 757, 763, 380 N.W.2d 625 (1986). Although the existence of a single badge of fraud may establish the existence of fraud, "[w]hen . . . several are found in the same transaction, strong, clear evidence will be required to repel the conclusion of fraudulent intent." *Id.* (quoting *Montana Nat. Bank v. Michels*, 193 Mont 295, 631 P.2d 1260 (1981)). Additionally, transfers between relatives, such as those here, are carefully scrutinized. *Prairie Lakes Health Care Sys. v. Wookey*, 1998 SD 99, ¶13, 583 N.W.2d 405, 413; *Jahner v. Jacob*, 252 N.W.2d 1, 6 (N.D. 1977), *aff'd* 515 N.W.2d 183 (N.D. 1994); *Ferrell v. Elling*, 84 Mont. 384, 388, 276 P. 432 (1929).

In North Dakota, consideration may be given, among other factors, to whether:

a. The transfer or obligation was to an insider;

b. The debtor retained possession or control of the property transferred after the transfer:

c. The transfer or obligation was disclosed or concealed;

d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

e. The transfer was of substantially all the debtor's assets;

f. The debtor absconded;

g. The debtor removed or concealed assets;

h. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

i. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

j. The transfer occurred shortly before or shortly after a substantial debt was incurred; and

46

k. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

NDCC § 13-02.1-04.

Although it is not necessary to show each and every badge of fraud according to *Gifford-Hill & Co.*, in this Proceeding, Wells Fargo has shown that a multitude of the badges are present. As such, James was required to present strong, clear evidence to repel the conclusion of fraudulent intent, and he wholly failed to do so. *Gifford-Hill*, 221 Neb. at 763. As shown at trial, under NDCC § 13-02.1-01(7)(a), an insider includes a relative of the debtor. In this case, Larry transferred all his real property to his son, James. Thus, the transfer was to an insider. Next, while the transfers from Larry to James in March of 2006 were not concealed, the alleged transfers via the unrecorded quitclaim deeds were concealed from everyone, including Farm Credit Services, Wells Fargo, Sundance Oil, the Internal Revenue Service, the Williams County Treasurer, the Williams County Clerk and Recorder, and James and Larry's accountant and at least until March of 2006, Larry continued to exert control over his one-third interest in the joint tenancy property.

Third, Jerald Lundgren testified that by March of 2006, Horob Livestock, Inc. had defaulted on its obligations to Wells Fargo and Larry had not complied with his obligations under the personal guaranty to Wells Fargo. Wells Fargo had commenced legal action. When questioned by counsel for Wells Fargo, Larry conceded at the trial that the March of 2006 transfers represented a transfer of all Larry's property:

> Q:    Mr. Horob, I'll try and be brief here, once you transferred the equipment and the real estate to Jim, basically that left you with your social security and your CRP payments and maybe a little bit of lease income, is that correct?

A:      Yes.

Q:      And in terms of assets, you basically had transferred all those to Jim.

A:      That's right.

Q:      So if you were obligated to Wells Fargo Bank or any other creditor, for that matter, you wouldn't have the ability on your own to repay loans or guarantees?

A:      That's correct.

Because of Larry's Guaranty and Horob Livestock's subsequent default, Larry was indebted to Wells Fargo in excess of $5,000,000 on the date of the transfers to James, and as a result, Larry's obligations far exceeded his assets, even if one considers his $312,541.67 interest in the joint tenancy property. *See* NDCC § 13-02.1-02(1).

Additionally, James' Exhibits A, B, F, P, R and S make reference to services that James purportedly provided to Larry. However, James did not elaborate on a value of such services and the evidence shows that Larry gave all his farming equipment and machinery to James as payment for services rendered. Given the failure by Larry or James to assign any value to the alleged services, this Court can only conclude that the value of the consideration Larry received in exchange for all his real property was not reasonably equivalent to the value of the property transferred to James. Considering the badges of fraud as discussed above, the Court concludes that Larry intended to hinder, delay or defraud his creditors, and in particular Wells Fargo, when he transferred all his assets to James. Therefore, the transfers of all Larry's real property are voidable as actual fraud under the UFTA.

In addition to being actually fraudulent, the transfers were also constructively fraudulent. Constructive fraud under the UFTA is established without regard to the intent of the parties.

48

*Farstveet*, 2000 ND 189, ¶ 23. A transfer is constructively fraudulent under North Dakota law if, 1) the creditor's claim arose before the transfer was made; 2) the transfer was made to an insider; 3) the transfer was for antecedent debt; 4) the debtor was insolvent at the time; and 5) the insider had reasonable cause to believe that the debtor was insolvent. NDCC § 13-02.1-05(2); *see also Farstveet*, at ¶ 23 (quoting *Prairie Lakes Health Care Sys., Inc., v Wookey*, 583 N.W.2d 405 (S.D. 1998). The constructive fraud statute is a preferential transfer concept and the policy behind the section is that an insolvent debtor must pay debts to non-relatives before paying insiders. *Farstveet*, at ¶¶ 21, 22.

The testimony and exhibits at trial show that all the elements of constructive fraud under the UFTA are present in this case. Jerald Lundgren testified that Wells Fargo's claim arose before the transfers took place because Larry personally guaranteed Horob Livestock's obligations to Wells Fargo and Horob Livestock defaulted on such obligations prior to the date Larry transfered all his real property to James. As discussed earlier, Larry transferred all his real property to James, his son, who is clearly an insider. NDCC § 13-02.1-01(7)(a).

Additionally, as previously discussed, the transfers of real property from Larry to James were for no consideration. However, even if Larry did owe James some consideration for services performed, the transfers to James were for services that predated the transfers. Moreover, the evidence is clear that Larry's liabilities exceeded his assets at all times relevant to the case and as such, Larry was insolvent at the time he transferred his assets to James.

Finally, James had reasonable cause to believe that Larry was insolvent at the time of the transfers. First, as a shareholder, director and 50% owner of Horob Livestock since its inception and due to his close relationship with Larry, the Court could easily conclude that James had

49

actual knowledge of Larry's guaranty of Horob Livestock's debt in excess of $5,000,000. However, even absent actual knowledge of Larry's personal guaranty, James would nonetheless have imputed knowledge of Larry's guaranty of the Horob Livestock debt given James' ownership of Horob Livestock, Inc.  As explained by one court, "[n]otice of facts which would incite a man of ordinary prudence to an inquiry, under similar circumstances, is notice of all the facts which a reasonable diligent inquiry would disclose."  *Jones v. Flatters*, 54 N.D. 459, 465, 209 N.W. 969 (1926) (deciding a bankruptcy preference action); *see also Nettles v. Childs*, 100 F.2d 952, 957 (4th Cir. 1939) ("[L]aw imputes knowledge when opportunity and interest, coupled with reasonable care, would necessarily impart it.").  Furthermore, officers and directors are generally accountable for having knowledge of anything they have a duty to know. *Nichols v. Brady Consultants, Inc.*, 305 N.W.2d 849, 851 (S.D. 1981). "Each director is charged with monitoring the heartbeat of the business and knowing where the corporation stands in regard to finances, obligations, goals, policies, etc. Where such a duty exists, ignorance due to neglect of that duty 'creates the same liability as actual knowledge and a failure to act thereon.'" *Mobridge Cmty. Indus. v. Toure*, 273 N.W.2d 128, 133-34 (S.D. 1978) (quoting *Fowler v. Elm Creek State Bank*, 198 Neb. 631, 254 N.W.2d 415 (1977)).  James is thus precluded from arguing that he did not have reasonable cause to believe that Larry was insolvent at the time of the transfers.

Wells Fargo has convincingly shown that its claim arose before Larry made the transfers; the transfers were from Larry to James, an insider; the transfers were for no consideration, or at best, the transfer was for an antecedent debt; and James had reasonable cause to believe that Larry was insolvent at the time of the transfers.  Accordingly, Larry's transfer was constructively fraudulent under the UFTA.

50

The Court, therefore, avoids the March 2006 Quitclaim Deeds as preferential transfers under 11 U.S.C. § 547 and as fraudulent conveyances under North Dakota's Uniform Fraudulent Transfer Act. The Quit Claim Deeds, being invalid, put the parties in the respective ownership positions they enjoyed prior to March 7, 2006. Wells Fargo is now free to seek judgment against Larry and/or James in the North Dakota State Court proceeding that is currently pending, which legal proceeding has already been disclosed on the public record by the Lis Pendens recorded by Wells Fargo on April 25, 2006, as shown in Exhibit 47.

The Trustee, however, asks this Court to partition the joint tenancy property and allow the Trustee to sell the bankruptcy estates' interests in Todd's one-third interest in the joint tenancy property, Todd's one-fourth interest in the 8 acre parcel and all of Horob Livestock, Inc.'s real property free and clear of any liens or other interests.

### PARTITION OF JOINTLY OWNED PROPERTY

On the topic of partition, the Supreme Court of North Dakota explained in *McKechnie v. Berg*, 2003 ND 628, 667 N.W.2d 628, 632 the following:

> Partition is an equitable remedy governed by equitable principles. *Murphy v. Murphy,* 1999 ND 118, ¶ 11, 595 N.W.2d 571; *Green v. Gustafson,* 482 N.W.2d 842, 849 n. 4 (N.D.1992); *Schnell v. Schnell,* 346 N.W.2d 713, 715 (N.D.1984). Trial courts have "wide judicial discretion in partition actions to 'do equity' and to make a fair and just division of the property or proceeds between the parties," and "great flexibility in fashioning appropriate relief for the parties." *Eastman v. Nelson,* 319 N.W.2d 134, 136 (N.D.1982). A trial court's findings in a partition action will not be reversed on appeal unless they are clearly erroneous. *Mougey Farms v. Kaspari,* 1998 ND 118, ¶ 33, 579 N.W.2d 583; *Bauch v. Bauch,* 1997 ND 89, ¶ 18, 563 N.W.2d 108; *Schnell,* 346 N.W.2d at 715. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, after reviewing all the evidence, we are left with a definite and firm conviction a mistake has been made. *Higgins v. Trauger,* 2003 ND 3, ¶ 10, 656 N.W.2d 9.

51

Although no North Dakota cases apparently exist on point, North Dakota law provides that with respect to partition, NDCC § 32-16-01 provides:

> When several cotenants hold and are in possession of real or personal property as partners, joint tenants, or tenants in common, in which one or more of them have an estate or inheritance, or for life or lives, or for years, an action may be brought by one or more of such persons for a partition thereof according to the respective rights of the persons interested therein....

The general rule is that a cotenant is entitled to partition as a matter of right, and not merely as a matter of grace within the discretion of the court. *See Schnell v. Schnell*, 346 N.W.2d 713 (N.D. 1984). While the right is sometimes said to be absolute, partition may be denied where it would be against public policy or legal or equitable principles, and the right may in appropriate circumstances be waived by agreement of the parties. 68 C.J.S. *Partition* 21; 59 Am.Jur.2d *Partition* § 30; 4 THOMPSON ON REAL PROPERTY § 1822 (1979); 2 TIFFANY ON REAL PROPERTY § 474 (3rd ed. 1939); 4A POWELL ON REAL PROPERTY § 611 (1949). North Dakota's partition statute provides that "(t)he rights of the several parties, plaintiff as well as defendant, may be put in issue, tried, and determined in such action". N.D. Cent. Code ("NDCC") § 32-16-08.

In the context of a bankruptcy case, 11 U.S.C. § 363(h) provides:

> Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if--
>
> > (1) partition in kind of such property among the estate and such co-owners is impracticable;
> >
> > (2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;

> (3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and
>
> (4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

3 COLLIER ON BANKRUPTCY, ¶ 363.08, pp. 363-63 and 64 (15th ed. rev.), explaining § 363(h), states:

> Because the provision authorizes a trustee to sell and thereby deprive a nondebtor of its property, there are significant conditions to the exercise of the power.
>
> * * *
>
> The Trustee must satisfy all these requirements to conduct a sale under section 363(h). The Bankruptcy Code gives the co-owner a right to match any price offered for the property [11 U.S.C. § 363(i)]. Of course, a sale of property free of a co-owner's interest may proceed with the co-owner's consent, regardless of the condition of § 363(h).

Subsection 363.08[4], pp. 363-69 and 363-70 further discusses subsection 363(h)(1) and states:

> Before depriving a nondebtor co-owner of property under section 363(h)(1), the court must find that the property cannot be physically or legally partitioned to permit the sale of only the debtor's interest.
>
> * * *
>
> Partition of non-residential real property may be easier [than the partition of single family residences]. For example, where, among other things, an appraisal set forth separate values for separate parcels of certain farmland, partition was held not impracticable. [*In re Batten*, 141 B.R. 899, 905 (Bankr. W.D. La. 1992)].
>
> Even if physically practicable, partition may be "legally impracticable". *In re Spear v. Crow Canyon Office Partners (In re Haley)*, [100 B.R. 13, 15 (Bankr. N.D.Cal. 1989], the property - a complex of office buildings - was subject to a single deed of trust. It was legally impracticable to partition the property because there was no way to allocate the secured debt between the parcel to be sold and the co-owner's parcel.

Since all conditions of § 363(h) must be met, it is readily apparent that partition in kind is the

53

only available remedy to the Trustee because the evidence here shows partition in kind is practicable and James made no objection at the trial to partition in kind if the Court found that various transfers of joint tenancy real property were null and void. Indeed, all parties concur that partition in kind is available with the Trustee has advanced a workable proposal for partition that is based on an appraisal that is not disputed.

Thus, the Court turns to the proposal advanced by the Trustee. The joint tenancy property at issue consists of 19 separate parcels. Some are contiguous and some are not. The value of each of the separate parcels is not in dispute. In addition, 9 of the 19 joint tenancy properties serve as security for the mortgages owing to Farm Credit Services. Roger Cymbaluk testified that the original Horob Family Farm, where James and his family reside, is located in the Western portion of Exhibit 118 in Section 26, parcel 10. Per Exhibit 199, the value of Todd's one-third interest in the joint tenancy property is $312,541.67. To equitably partition the property, allow James to retain the original Horob Family Farm, and cause the least amount of disruption, Roger Cymbaluk proposed that the Trustee be awarded certain property located in Williston, North Dakota and referred to as the transitional property, valued at $47,500.00 and described by Roger Cymbaluk as T154, R101, Section 12 located in NW¼NE¼. In addition, Roger Cymbaluk proposed that the Trustee receive parcel 13 on Exhibit 118a, valued at $186,686.00 and described as T155, R104, Section 2 in the NE¼, SW¼, NW¼, N½SE¼, along with parcel 17 as shown on Exhibit 118a, valued at $79,975.00 and described as T155, R103, Section 19: Lots 1, 2, 3, 4, SE¼NW¼, E½SW¼. The transitional property and parcels 13 and 17 are unencumbered, have a combined value of $314,161.00 and do not contain any land that was part of the original Horob Family Farm.

James argued at trial that the value of Todd's minority one-third interest in the joint tenancy property should be adjusted downward by 10 to 30 percent to reflect a minority discount. Nothing in the record, however, supports such assertion and this Court finds that neither Larry, James nor Todd own, on their own behalf, a majority interest in the joint tenancy property. Given the absence of any true majority interest, the Court finds that adjusting the value of Todd's minority interest is not appropriate. Moreover, the sale of the partitioned property by the Trustee, after exposure to the market, will adequately fix the market value of the real property.

Next, James argued at the trial that if the Court finds that the unrecorded quit claim deeds are not valid, which the Court has found, and if the Court partitions the property, which it is hereby doing, that James should receive credit for the real property taxes and loan payments that he has paid on the property since March of 2006. James wholly failed to offer any evidence as to what he has paid in taxes for the transitional property and for parcels 13 and 17. However, looking at Exhibit 114, the Court estimates that the taxes for the 2006 tax year on the transitional property and parcels 13 and 17 were roughly $2,884.02. The taxes for 2007 most likely increased slightly, but as noted above, James offered no evidence as to what the 2007 property taxes are or were and based upon Exhibit EE, such taxes have probably not yet been paid. Accordingly, the Court finds that any property taxes paid by James are more than offset by the rent that would be due to Todd and/or Horob Livestock, Inc. for the use of the various parcels of land.

As for mortgage payments, it appears that James made one mortgage payment to Farm Credit Services of North Dakota, but that loan was in the name of Larry, and thus, James has failed to show that the mortgage payment was on behalf of Todd or Horob Livestock, Inc. Consequently, the Court denies James' request for an offset based upon the $31,743.55 mortgage

55

payment made by James on or about May 31, 2007.

Finally, James maintains that he is entitled to an equitable lien of $711,057.50 against Todd's interest in the joint tenancy property and against the Horob Livestock, Inc. property for the monies he is owed by Todd and Horob Livestock, Inc. as summarized in Exhibit N. James' claim of an equitable lien fails for the same reasons as James' reliance on the unrecorded deeds failed. As correctly argued by the Trustee, perfection of a lien against real property as against subsequent purchasers and encumbrancers is accomplished by recordation. NDCC § 35-03-07. Until recordation occurs, an unrecorded mortgage or lien, while effective as between the parties themselves, is ineffective as against a bona fide purchaser for value. NDCC § 47-10-08. In short, 11 U.S.C. § 544(a)(3) allows the Trustee to trump any unrecorded lien that James may claim at this late date.

IT IS THEREFORE ORDERED that the Court will enter separate Judgments in favor of the Trustee and Wells Fargo and against James L Horob and Larry Horob; and the transfers by Todd K. Horob and Larry Horob to James L. Horob of the following real property in March of 2006 are hereby set aside and declared void under 11 U.S.C. § 547 and fraudulent under North Dakota's Uniform Fraudulent Transfer Act:

Township 155 North, Range 104 West, 5th P.M.
Section 1: NW¼
Section 2: NE¼, SW¼, NW¼, N½SE¼
Section 2: 1/5th interest in the S½SE¼
Section 10: Lots 1(33.24), 2(33.16), E½NE¼ a/k/a NE¼
Section 11: NE¼
Section 13: NW¼
Section 24: E½NE¼, SE¼, except W½W½SE¼

Township 155 North, Range 103 West, 5th P.M.
Section 19: Lots 1(34.99), 2(35.04), 3(35.08), 4(35.13), SE¼NW¼, E½SW¼

56

Township 154 North, Range 101 West, 5th P.M.
Section 12: A parcel of land located in the NW¼NE¼ of Section 12, Township 154 North, Range 101 West, more particularly described as follows: Beginning at a point 16 feet east of the SW corner of NW¼NE¼ of said Sec. 12; thence North 0° 02' East, parallel to and 16 feet from the north-south one-quarter line of said Sec. 12 a distance of 631.7 feet to a point; thence North 89° 39' East a distance of 337 feet; thence North 0° 12' West a distance of 150 feet to a point on the South line of the Mattison Subdivision; thence North 89° 43' East along the South line of said Mattison Subdivision extended a distance of 969.2 feet to the east line of NW¼NE¼ of Sec. 12; thence South 0° 06' East along said east line of NW¼NE¼ a distance of 781.2 feet to the SE corner of said NW¼NE¼; thence South 89° 40' West along the South line of said NW¼NE¼ of Sec 12 a distance of 1307.8 feet to point of beginning, except those parts thereof heretofore deeded and conveyed by Warranty Deeds recorded in the Office of the Register of Deeds of said County in Book 209 Deeds, Pg 5; Book 209 Deeds, Pg 438; Book 209 Deeds, Pg 473; and Book 210 Deeds, Pg 367, containing 19.58 acres, more or less (the "19 Acre Parcel")

Township 156 North, Range 104 West, 5th P.M.
Section 10: Lots 3(36.99), 4(36.73), E½SE¼ a/k/a SE¼
Section 11: SE¼
Section 13: NW¼
Section 14: NE¼, W½NW¼, W½SW¼
Section 15: Lots 1(36.49), 2(36.27), E½NE¼ a/k/a NE¼
Section 22: Lots 1(35.59), 2(35.31), E½NE¼ a/k/a NE¼
Section 23: NW¼, SW¼, SE¼
Section 25: E½NW¼, E½SW¼
Section 26: NE¼, NW¼, SE¼, except deeded parts, S½SE¼SE¼SE¼
Section 36: NW¼, SW¼

IT IS FURTHER ORDERED that the Court will enter a separate Judgment in favor of the Trustee and against James L Horob; and the transfers of real property by Todd K. Horob and/or Horob Livestock, Inc. to James L. Horob of the following real property in March of 2006 are hereby set aside and declared void under 11 U.S.C. § 547:

The Lot 10 in Block 10 of BRUEGGER'S SECOND ADDITION TO WILLISTON, North Dakota, according to the recorded Plat thereof on file in the office of the County Recorder of said County.

The Sublot 1 in S½SE¼ of Section 19 in Township 154 North, Range 101 West

57

of the Fifth Principal Meridian, Williams County, North Dakota, according to the recorded Plat thereof on file in the office of the County Recorder of said County.

Township 154 North, Range 101 West, 5th P.M.
Section 12: That part of the NW¼NE¼ described as follows:
Commencing at a point 671.1 feet East of the Quarter Section corner between Sections 1 and 12 in said Township and Range, continuing thence East a distance of 655.2 feet; thence South at right angles 538 feet; thence West at right angles 655.2 feet; thence North at right angles 538 feet to the point of beginning, containing 8.09 acres, more or less (the "8 Acre Parcel").

IT IS FURTHER ORDERED that this Court will enter a separate Judgment decreeing that this Court has jurisdiction to partition the property jointly owned by the parties as joint tenants and grant relief according to the Plaintiff/Trustee's partition Complaint; and the Plaintiff/Trustee is granted as the sole legal owner, with the right of possession as of the date of this decree, the transitional property, valued at $47,500.00 and described by Roger Cymbaluk as T154, R101, Section 12 located in NW¼NE¼, parcel 13 on Exhibit 118a, valued at $186,686.00 and described as T155, R104, Section 2 in the NE¼, SW¼, NW¼, N½SE¼, and parcel 17 as shown on Exhibit 118a, valued at $79,975.00 and described as T155, R103, Section 19: Lots 1, 2, 3, 4, SE¼NW¼, E½SW¼.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

58